



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

# FELONY

## INDICTMENT FOR CONSPIRACY, HEALTH CARE FRAUD, PAYING AND RECEIVING ILLEGAL REMUNERATIONS, AND ASSET FORFEITURE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL ACTION **13-243** |
| VERSUS | * | NUMBER: |
| TRACY RICHARDSON BROWN SANDRA PARKMAN THOMPSON | * | SECTION: **SECT. K MAG. 3** |
| | * | VIOLATIONS:<br>*18 USC § 1349* |
| | * | *18 USC § 1347*<br>*18 USC § 371* |
| | * | *42 USC § 1320a-7b(b)(1)(A)*<br>*42 USC § 1320a-7b(b)(2)(A)*<br>*18 USC § 2* |
| * | * * | |

The Grand Jury charges that:

### COUNT 1

**A.    AT ALL TIMES MATERIAL HEREIN:**

#### Medicare

1.     The Medicare Program (Medicare) was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.

Medicare was administered by the Centers for Medicare and Medicaid Services (CMS), an agency of the United States Department of Health and Human Services (HHS). Individuals who received benefits under Medicare were often referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program" as defined by 18 U.S.C. § 24(b).

3. Medicare Part B helped pay for certain physician services, outpatient and other services, including durable medical equipment (DME) that was medically necessary and was ordered by licensed medical doctors or other qualified health care providers. DME is equipment that is designed for repeated use and for a medical purpose, such as a power wheelchair, accessories associated with power wheelchairs (such as batteries, seat cushions, and spare tires), and orthotics (such as foot, ankle, knee, wrist, elbow, back and shoulder braces).

4. For Louisiana beneficiaries, Medicare Part B insurance covering DME and related health care benefits, items, and services was administered by Palmetto Government Benefit Administrators through June 1, 2007, and thereafter by CIGNA Government Services (CIGNA), pursuant to contracts with HHS. Palmetto and CIGNA received, adjudicated, and paid the claims submitted to them by Medicare beneficiaries, physicians, or suppliers of health care items and services.

5. DME companies, physicians, and other health care providers that sought to participate in Medicare Part B and bill Medicare for the cost of DME and related benefits, items, and services were required to apply for and receive a "supplier number." The supplier number allowed a DME company to submit bills or "claims" to Medicare to obtain reimbursement for the cost of DME and related health care benefits, items, and services that a DME company had supplied to beneficiaries.

6. To receive payment from Medicare, a DME company, using its supplier number, submitted a health insurance claim form, known as a CMS-1500. Medicare permitted DME companies to submit a CMS-1500 electronically or by way of a paper claim form. The CMS-1500 required DME companies to provide certain information, including: (a) the Medicare beneficiary's name; (b) the Medicare beneficiary's identification number; (c) the name and identification number of the doctor who ordered the item or service that was the subject of the claim; (d) the health care benefit, item, or service that was supplied or provided to the beneficiary; (e) the billing code for the benefit, item, or service; and (f) the date on which the benefit, item or service was provided. When the claim was submitted, the provider certified that the contents of the form were true, correct, and complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program.

7. Medicare, through Palmetto and CIGNA, generally paid a substantial portion of the cost of the DME or related health care benefit, item, or service if it was medically necessary and ordered by a licensed, qualified health care provider.

8. Payments under Medicare Part B were often made directly to the DME company. For this to occur, the beneficiary would assign the right of payment to the DME company or other health care provider. Once such an assignment took place, the DME company assumed the responsibility for submitting claims to, and receiving payments from, Medicare.

9. Approved claims submitted to Medicare Part B were paid at 80% of the approved amount for each claim. Unless a Medicare beneficiary held supplemental or secondary insurance, Medicare required that the beneficiary be responsible for paying the remaining 20% of

the claim, known as the co-pay. Waiver of this co-pay was not permitted under Medicare billing procedures.

10. **TRACY RICHARDSON BROWN (BROWN)** owned, operated and managed Psalms 23 DME, LLC (Psalms 23), a limited liability company organized and existing under the laws of Louisiana, doing business in New Orleans, Louisiana. Among other things, Psalms 23 was in the business of providing wheelchairs, orthotics, and other DME to Medicare beneficiaries. On about February 2, 2004, **BROWN** and her husband applied to CMS for a Medicare provider number. On about March 12, 2004, Psalms 23 received a Medicare supplier number and became eligible to receive reimbursement from Medicare for services and equipment that Psalms 23 provided to beneficiaries, assuming that such equipment was medically necessary, had been ordered by a physician, and the equipment provided met the description of the equipment billed to Medicare.

11. **BROWN** submitted claims to Medicare on behalf of Psalms 23 using "Healthcare Common Procedure Coding System ("HCPCS"), a series of five-digit codes that corresponded to various types of medical goods, items, and services.

12. **SANDRA PARKMAN THOMPSON (THOMPSON)**, Melaney Williams Batiste (Batiste), and others were marketers who recruited Medicare beneficiaries for **BROWN** and Psalms 23.

13. Michael Selwyn Hunter (Hunter), Stephen Anthony Jase (Jase), and "Physician 3" were medical doctors who operated separate medical practices in New Orleans, Louisiana, and elsewhere.

4

## B. THE CONSPIRACY:

14. Beginning in or about February 2005, and continuing until in or about February 2009, in the Eastern District of Louisiana and elsewhere, the defendants, **TRACY RICHARDSON BROWN and SANDRA PARKMAN THOMPSON** and others known and unknown to the Grand Jury, including Batiste, Hunter, Jase, and Physician 3, willfully and knowingly did combine, conspire, confederate and agree together and with each other to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of Medicare in connection with the delivery of and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347.

## C. OBJECT OF THE CONSPIRACY:

15. The principal objective of **BROWN, THOMPSON**, Batiste, and Physician 3, and others known and unknown to the Grand Jury was to use Psalms 23 to fraudulently bill Medicare for DME that was not medically necessary and/or not provided. Hunter, Jase and Physician 3 falsified documentation routinely used by DME suppliers to support Medicare billing. Physician 3 provided the fraudulent documentation directly to **BROWN**. Otherwise, Hunter and Jase provided the falsified documentation to marketers, including **THOMPSON,** Batiste and others, who gave it to **BROWN** and Psalms 23. **BROWN** knew that Medicare and its contractors required that DME suppliers maintain specific required documentation, usually created by physicians of beneficiaries, in their facilities to support Medicare billing.

5

16. Between June 30, 2004 and June 26, 2009, **BROWN** and Psalms 23 submitted and caused to be submitted fraudulent bills to Medicare totaling approximately $3,203,604 for power wheelchairs, power wheelchair accessories, and orthotic items; Medicare paid **BROWN** and Psalms 23 approximately $1,972,870.

## D. WAYS AND MEANS TO ACCOMPLISH THE CONSPIRACY:

17. **BROWN** paid **THOMPSON**, Batiste and others as "marketers" to locate physicians willing to falsely certify patients for motorized wheelchairs, wheelchair accessories, and other orthotic devices. Physicians, including Hunter and Jase, falsely completed documentation fraudulently attesting to a Medicare beneficiary's medical necessity for DME and provided the documentation to the marketers, **THOMPSON** and Batiste, among others. **THOMPSON**, Batiste and other marketers provided the false documentation to **BROWN** and Psalms 23 that was then used to support false billing to Medicare. In return for the falsified documentation provided by the marketers, **BROWN** paid **THOMPSON**, Batiste, and other marketers set amounts for each motorized wheelchair and other orthotic order.

18. **BROWN** paid Physician 3 to certify patients for motorized wheelchairs, wheelchair accessories, and other orthotic devices. In order to conceal the nature of the payments to Physician 3, **BROWN** made checks payable to Physician 3's mother instead of directly to Physician 3.

19. Many of the orthotic devices **BROWN** and Psalms 23 billed to Medicare were components of what was referred to as an "arthritis kit." Although an arthritis kit was neither an official medical term nor a term used by Medicare, the term was commonly used by individuals working within the DME industry to refer to a package of items that included back, bilateral

elbow, knee, ankle, wrist and shoulder braces, gloves and a heating pad or a heat lamp. Each individual item in the arthritis kit was reimbursable by Medicare if it was medically necessary, ordered by a physician, and actually delivered to the Medicare beneficiary.

20. The prices for the items in the arthritis kits varied. **BROWN** caused Psalms 23 to bill Medicare for highly reimbursed items regardless of the needs of the patient or the request of the physician. When **BROWN** provided orthotic items to a patient, it was a far cheaper version of an item that did not meet the description of the HCPCS code billed to Medicare. Additionally, **BROWN** caused billings to Medicare for bilateral knee and elbow braces for nearly every beneficiary who received orthotics regardless of medical need.

21. In the case of motorized wheelchairs, **BROWN** maintained documentation falsely justifying the medical necessity of motorized wheelchairs. The documentation frequently received from marketers, including **THOMPSON**, contained other false or misleading information to make the Medicare beneficiary appear to require the wheelchair for basic mobility when **BROWN** and **THOMPSON** well knew that the beneficiaries did not need or otherwise qualify for these motorized wheelchairs. **BROWN** routinely fraudulently billed Medicare for providing wheelchair accessories along with the motorized wheelchairs; however, **BROWN** failed to provide most of the accessories billed to Medicare.

22. **THOMPSON** fraudulently obtained prescriptions for motorized wheelchairs, wheelchair accessories and arthritis kits from Jase when **THOMPSON** well knew that the Medicare patient neither qualified for, nor needed, the DME. In most cases, **THOMPSON** knew that Jase had never seen or treated the Medicare beneficiary.

23. For each motorized wheelchair referral submitted to Psalms 23, **BROWN** paid **THOMPSON** and other marketers approximately $500; for each arthritis kit referral, **BROWN** paid **THOMPSON** and other marketers between about $200 and $250. **BROWN** paid Physician 3 $250 for each prescription Physician 3 signed.

24. While Medicare would typically pay 80% of the approved billing submitted by Psalms 23, the Medicare beneficiary receiving the equipment was responsible for paying 20% of the approved billing unless the beneficiary held secondary health insurance. **BROWN** fraudulently waived the 20% co-payment requirement for beneficiaries in order to encourage beneficiaries receiving unwanted or unnecessary equipment to keep it without complaint.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2

### A. AT ALL TIMES MATERIAL HEREIN:

25. The allegations of Count 1, Section A, are incorporated as though fully set forth herein.

### B. THE CONSPIRACY:

26. Beginning in or about February 2005, and continuing until in or about February 2009, in the Eastern District of Louisiana and elsewhere, the defendants **TRACY RICHARDSON BROWN** and **SANDRA PARKMAN THOMPSON** did knowingly and willfully conspire with each other and with others, both known and unknown to the grand jury:

    1. to knowingly and willfully offer and pay any remuneration (including any kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer Medicare

      beneficiaries to Psalms 23 for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under the Medicare program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

2. To knowingly and willfully solicit and receive any remuneration (including any kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under the Medicare program, in violation of Title 42 U.S.C. 1320a-7b(b)(1)(A).

C. **OVERT ACTS:**

27. Counts 12 through 18 of this indictment are incorporated as overt acts of the conspiracy.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 3-11

## HEALTH CARE FRAUD

A. **AT ALL TIMES MATERIAL HEREIN:**

28. The allegations of Count 1, Section A, are incorporated as though fully set forth herein.

B. **HEALTH CARE FRAUD:**

29. Beginning in or about June 2004, and continuing until in or about June 2009, in the Eastern District of Louisiana and elsewhere, the defendants **TRACY RICHARDSON**

9

BROWN and **SANDRA PARKMAN THOMPSON** and others known and unknown to the grand jury did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, the Medicare program for durable medical equipment that was not medically necessary and/or not provided.

30. It was part of the scheme and artifice to defraud that **THOMPSON** solicited patient information from Jase she could use to support an order for DME from Psalms 23. **BROWN** submitted fraudulent claims to Medicare based on paid referrals submitted by **THOMPSON** that were signed by Jase.

31. It was further part of the scheme and artifice to defraud that **THOMPSON** offered Medicare beneficiaries cash if they would consent to taking DME that would be ordered on their behalf.

32. It was further part of the scheme and artifice to defraud that Jase provided **THOMPSON** with blank signed prescription forms to facilitate her getting equipment to patients faster and that **THOMPSON** fraudulently used those prescription forms to falsely submit orders for DME on behalf of Medicare beneficiaries.

33. It was further part of the scheme and artifice to defraud that between May 5, 2008, and February 2, 2009, in return for bringing Psalms 23 orders for motorized wheelchairs and arthritis kits, **BROWN** paid **THOMPSON** approximately $48,700.

34. It was further part of the scheme and artifice to defraud that **BROWN** made incentivized payments to other marketers that brought DME orders for motorized wheelchairs and arthritis kits that they brought to Psalms 23.

35. It was further part of the scheme and artifice to defraud that **BROWN**, upon learning that referrals from one of her marketers contained forged signatures of physicians, took no action to meaningfully investigate whether Medicare had paid fraudulent claims. In about February 2008, a physician notified **BROWN** that the physician's name had been forged on DME prescriptions submitted to Psalms 23. **BROWN**, knowing that she had paid a marketer for referrals she obtained from the complaining physician and had submitted claims to Medicare for reimbursement for the DME ordered as a result of those prescriptions, took no action to investigate any of that marketer's referrals made before or after **BROWN'S** discovery of the forgery. **BROWN** made no attempts to reimburse Medicare for fraudulent claims she knew had been made as a result of falsified prescriptions.

36. It was further part of the scheme and artifice to defraud that **BROWN** submitted fraudulent claims to Medicare based on paid referrals submitted by Batiste that were signed by Hunter.

37. It was further part of the scheme and artifice to defraud that **BROWN** coached Batiste on how face-to-face evaluations for motorized wheelchairs, documentation required by Psalms 23 to be maintained along with any claim, should be completed in order to ensure reimbursement by Medicare. **BROWN** specifically instructed Batiste on how the Face-to-Face Examination Report should be completed including, but not limited to, that the question, "Is the patient unable to self-propel any type of manual wheelchair?" should always be answered "Yes," and that the face-to-face examination report should always reflect that the patient had severe weakness in the upper extremities.

38. It was further part of the scheme and artifice to defraud that when attempts were made by a Psalms 23 employee to verify the veracity of DME orders of Hunter, **BROWN** told the employee not to pursue the inquiry.

39. It was further part of the scheme and artifice to defraud that between February 3, 2005, and February 17, 2009, in return for bring Psalms 23 orders for motorized wheelchairs and arthritis kits, **BROWN** paid Batiste approximately $81,025.

C.  **EXECUTIONS**:

40. **BROWN** and **THOMPSON**, and other Marketers listed below fraudulently submitted and caused to be submitted to Medicare for reimbursement the below-listed falsified claims for DME to Medicare:

| Count | Date | Claim Number(s) | Recipient | DEFENDANT/Marketer |
|---|---|---|---|---|
| 3 | December 11, 2008 | 08343733473000 | ShGa | **BROWN** **THOMPSON** |
| 4 | December 13, 2008 | 08343733474000 | ShGa | **BROWN** **THOMPSON** |
| 5 | December 3, 2008 | 08330767696000 08330767697000 | OlBa | **BROWN** **THOMPSON** |
| 6 | December 24, 2008 | 08351729638000 | OlBa | **BROWN** **THOMPSON** |
| 7 | March 25, 2009 | 09044791628000 | MoBl | **BROWN** **THOMPSON** |
| 8 | January 23, 2009 | 09019821501000 | ReDa | **BROWN** Batiste |

| Count | Date | Claim Number(s) | Recipient | DEFENDANT/ Marketer |
|---|---|---|---|---|
| 9 | January 28, 2009 | 09019821499000 | ReDa | **BROWN** Batiste |
| 10 | April 18, 2009 | 09085705117000 | VeFu | **BROWN** Batiste |
| 11 | November 5, 2008 | 08302782824000 | ShKl | **BROWN** Batiste |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 12-18

## ILLEGAL REMUNERATION

**A. AT ALL TIMES MATERIAL HEREIN:**

41. The allegations of Count 1, Section A, are incorporated as though fully set forth herein.

**THE KICKBACKS:**

42. Beginning in or about February 2005, and continuing until in or about February 2009, in the Eastern District of Louisiana and elsewhere, the defendant **TRACY RICHARDSON BROWN** knowingly and willfully offered and paid remuneration, including any kickback, bribe, and rebate, directly and indirectly, overtly and covertly, in cash and in kind to defendant **SANDRA PARKMAN THOMPSON** and others to induce such persons to refer Medicare beneficiaries to Psalms 23 for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under the Medicare program, in violation of Title 42, United States Code, Section 1320a-7b.

43. Also, beginning in or about February 2005, and continuing until in or about February 2009, in the Eastern District of Louisiana and elsewhere, the defendant **THOMPSON** and others knowingly and willfully solicited and received remuneration from defendant **BROWN**, including any kickback, bribe, and rebate, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under the Medicare program, in violation of Title 42 U.S.C. 1320a-7b(b)(1)(A).

44. The following approximate payments were made by **BROWN** to **THOMPSON** and Batiste in exchange for **THOMPSON** and Batiste providing names of Medicare beneficiaries who had coverage for DME equipment, and in exchange for physicians agreeing to prescribe DME for selected Medicare beneficiaries who had coverage for DME equipment:

| Count | Date | Amount | DEFENDANT/Marketer | Beneficiary |
|---|---|---|---|---|
| 12 | November 6, 2008 | $750 | **BROWN** Batiste | ShKl |
| 13 | November 12, 2008 | $500 | **BROWN** **THOMPSON** | OsLe |
| 14 | November 24, 2008 | $750 | **BROWN** **THOMPSON** | LeBr |
| 15 | November 24, 2008 | $750 | **BROWN** **THOMPSON** | ClBr |
| 16 | February 2, 2009 | $750 | **BROWN** **THOMPSON** | ShGa |
| 17 | February 2, 2009 | $750 | **BROWN** **THOMPSON** | OlBa |
| 18 | January 23, 2009 | $750 | **BROWN** Batiste | ReDa |

All in violation of Title 42, United States Code, Sections 1320a-7b(b)(1)(A) and 1320a-7b(b)(2)(A).

## ASSET FORFEITURE

**A.** The allegations contained in Counts 1 and 3 through 11 are hereby incorporated as though fully set forth herein for the purpose of charging criminal forfeiture to the United States of America pursuant to Title 18, United States Code, Section 982.

**B.** As a result of being convicted of a health care offense as defined in Title 18, United States Code, Section 24, as charged in Counts 1 and 3 through 11 herein, the defendants **TRACY RICHARDSON BROWN** and **SANDRA PARKMAN THOMPSON** shall forfeit to the United States all property, real and personal, involved in the aforesaid offenses and all property representing proceeds of those offenses and such property traceable to those proceeds including, but not limited to:

1. **THREE MILLION TWO HUNDRED AND THREE THOUSAND SIX HUNDRED FOUR AND 00/100 ($3,203,604.00)** in United States Currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property which was involved in the aforestated offenses or is traceable to such property.

**C.** If any of the above-described forfeited property, as a result of any act or omission of the defendants,

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred, sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

    All in violation of Title 18, United States Code, Section 982.

               A TRUE BILL:

               _____
               FOREPERSON

JEFFREY KNOX
CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
PATRICE HARRIS SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
Louisiana Bar No. 14987

_____
ARUNABHA BHOUMIK
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE
New York Bar No. 4280848

New Orleans, Louisiana
November 1, 2013

16

No.

FORM OBD-34

**UNITED STATES DISTRICT COURT**

Eastern __ District of __ Louisiana
__ Criminal __ Division

**THE UNITED STATES OF AMERICA**

vs.

**TRACY RICHARDSON BROWN**
**SANDRA PARKMAN THOMPSON**

**INDICTMENT**

INDICTMENT FOR CONSPIRACY, HEALTH CARE FRAUD, PAYING AND RECEIVING ILLEGAL REMUNERATIONS, AND ASSET FORFEITURE

**VIOLATIONS:**
18 USC § 1349, 18 USC § 1347, 18 USC § 371,
42 USC § 1320a-7b(b)(1)(A), 42 USC § 1320a-7b(b)(2)(A) and 18 USC § 2

A true bill.

_____ Foreperson

Filed in open court this _____ day of _____ A.D. 2013.

_____ Clerk

Bail, $ _____

PATRICE HARRIS SULLIVAN
Assistant United States Attorney